ROBERTSON, Presiding Judge.
This is the third time this case has been before this court. Except as follows, the procedural background of this case is as set forth in our initial opinion, Plumbers & Steamfitters, Local 52 v. Alabama Dep’t of Envtl. Management, 622 So.2d 343 (Ala.Civ. App.1992), and in the opinion of our supreme court, Ex parte Plumbers & Steamfitters, Local 52, 622 So.2d 347 (Ala.1993).
On March 5, 1993, in compliance with our supreme court’s holding, we reversed the judgment of the Montgomery County Circuit Court and remanded the cause to that court for further proceedings. Plumbers & Steamfitters, Local 52 v. Alabama Dep’t of Envtl. Management, 622 So.2d 350 (Ala.Civ. App.1993). On remand from this court, the trial court entered a judgment in favor of the Alabama Department of Environmental Management (ADEM) and against the Plumbers and Steamfitters, Local 52 (Local 52), on April 7, 1994. The trial court held that the decision of the Alabama Environmental Management Commission (Commission) upholding ADEM’s issuance of permits to operate two additional boilers at a plasties manufacturing plant operated by General Electric Company (GE) in Burkville, Alabama, was “supported by substantial evidence.”
Local 52 appeals to this court, raising two issues: (1) whether the Commission erred in finding that ADEM had correctly determined that the pollution control device proposed by GE represented the “best available control technology” (BACT) for its boilers; and (2) whether the Commission erred in not requiring ADEM to perform an “air impact analysis” for arsenic and benzene before issuing the permits.
Judicial review of the Commission’s determination is guided by § 41-22-27(f), Ala.Code 1975, which provides, in pertinent part:
“Except as provided in [§ 22-22A-7(c)(6), Ala.Code 1975], judicial review of any order of the [Commission] modifying, approving or disapproving an administrative action of [ADEM] shall be in accordance with the provisions for review of final agency decisions of contested cases in [§§ 41-22-20 and 41-22-21, Ala.Code 1975].”
In Ex parte Plumbers & Steamfitters, Local 52, our supreme court clarified the interaction between § 41-22-27(f) and § 22-22A-7(c)(6):
“[W]e emphasize that § 22-22A-7(c)(6) prescribes the rules for perfecting appeals from the [Commission]. Thus, the ‘except as provided for in § 22-22A-7(c)(6)’ language found in the [Administrative Procedure Act] at § 41-20-27(f) would not apply to exclude the coverage of § 41-22-20 where it addresses questions unrelated to perfecting such an appeal. See, e.g., [§ 41 — 22—20(j), Ala.Code 1975] (which provides that ‘[t]he review shall be conducted by the court without a jury’).”
622 So.2d at 349. Therefore, because it concerns a matter unrelated to the perfecting of *795 an appeal, judicial review of a decision of the Commission is governed by §§ 41-22-20 and -21. See Ex parte Plumbers & Steamfitters, Local 52.
Pursuant to § 41-22-20(k), the trial court must give the Commission’s decision a presumption of correctness, and it may not substitute its judgment for that of the Commission as to the weight of the evidence on questions of fact. The decision of the Commission must be upheld unless:
“substantial rights of the petitioner have been prejudiced because the [Commission’s] action is:
“1. In violation of constitutional or statutory provisions;
“2. In excess of the statutory rule of the agency;
“3. In violation of any pertinent agency rule;
“4. Made upon unlawful procedure;
“5. Affected by other error of law;
“6. Clearly erroneous in view of the rehable, probative, and substantial evidence on the whole record; or
“7. Unreasonable, arbitrary or capricious, or characterized by an abuse of discretion or a clearly unwarranted exercise of discretion.”
§ 41-22-20(k). In reviewing the determination of the Commission, this court’s standard of review is the same as that of the trial court. Dawson v. Alabama Dep’t of Envtl. Management, 529 So.2d 1012 (Ala.Civ.App.1988).
With this standard in mind, we address Local 52’s first issue, i.e., whether substantial evidence supports the Commission’s finding that ADEM correctly had determined that the pollution control device proposed by GE represented BACT for its two new boilers.
BACT is defined in 42 U.S.C. § 7479, a provision within the Clean Air Act, as follows:
“[BACT] means an emission limitation based on the maximum degree of reduction of each pollutant subject to regulation under this chapter emitted from or which results from any major emitting facility, which the permitting authority, on a case-by-ease basis, taking into account energy, environmental, and economic impacts and other costs, determines is achievable for such facility through application of production processes and available methods, systems, and techniques....”
The corresponding state provision, § 335-3-14-.04(2)(1), ADEM Admin.Code, formerly § 16.4.2.(1), Ala.Admin. & Proced.Code of Rules & Regs., tracks the federal definition almost verbatim.
Local 52 does not dispute that, in determining whether to issue the permits, ADEM took into account the “energy, environmental, and economic impacts and other costs” associated with GE’s two proposed boilers. Instead, Local 52 contends that ADEM did not require GE to use a “top-down” approach in approving GE’s proposed pollution control technology, “low NOx burners,” to limit the boilers’ emission of nitrogen oxide. Citing memorandums and other documents generated by the Environmental Protection Agency (EPA), Local 52 contends that the “top-down” approach requires the permit applicant either to use the most stringent pollution control technology, or, if the applicant chooses not to use the most stringent control technology, to show with particularity why it opposes each more stringent control technology. According to a December 1, 1987, EPA memorandum, “[a] final BACT determination which still fails to reflect adequate consideration of the factors that would have been relevant using a ‘top-down’ type of analysis shall be considered deficient by EPA.”
In particular, Local 52 contends that “ADEM could not identify any factor which precluded GE from using [Flue Gas Recirculation (FGR) ], ammonia injection [also known as “Thermal DeNOx”], or [Selective Catalytic Reduction (SCR) ] technology” rather than low NOx burners as its nitrogen oxide control technology. However, the permit application for the two boilers, which GE submitted to ADEM in 1988, includes an analysis of all three alternative control technologies cited by Local 52 and an explanation as to GE’s decision not to use any one of those technologies. Furthermore, as Local 52 concedes in its brief, the EPA evaluated *796 and concurred with ADEM’s decision to approve low NOx burners as GE’s nitrogen oxide control technology.
The Commission found that ADEM’s BACT determinations “balanced the factors of energy, economics, environmental impacts and other costs, on [a] ease-by-ease basis as required in [§ 335-3-14 — 04(2)(1) ].” Moreover, the Commission found that “the analysis and research of [ADEM] and GE [were] sufficient to satisfy the recommendations contained in EPA’s ‘top-down’ policy guidelines.” In light of the evidence and the presumption of correctness that accompanies the Commission’s decision, we conclude that the Commission did not err in finding that ADEM correctly had determined that the pollution control device proposed by GE represented BACT for its two new boilers.
We now consider whether the Commission erred in not requiring ADEM to perform an “air quality impact analysis” for arsenic and benzene before issuing the permits.
Unlike the BACT requirement, the air quality impact analysis requirement focuses upon the impact that the proposed emissions source will have upon the air quality in the surrounding area, taking into account operations already in existence. § 335-3-14-.04(12)(a)(l), ADEM Admin.Code. Local 52 concedes that GE met BACT requirements as to arsenic and benzene emissions from its proposed boilers. However, Local 52 contends that, although an air quality impact analysis was required, one was not performed.
The Alabama regulations governing the air quality impact analysis sought by Local 52 includes two subsections. The first generally requires ADEM to conduct monitoring of air quality for one year in order to establish background pollutant levels. § 335-3-14-.04(12)(a)(l). However, pursuant to § 335-3 — 14—.04(12) (a) (2), non-criteria pollutants (those pollutants, such as arsenic and benzene, for which no specific standard or limit is set within the regulations), require only “such air quality monitoring data as the Director determines is necessary to assess ambient air quality for that pollutant in any area that the emissions of that pollutant would affect.” Furthermore, pursuant to § 335 — 3—14—.04(8) (h):
“The Director may exempt a stationary source or modification from the requirements of [§ 335 — 3—14—.04(12) ] with respect to monitoring for a particular pollutant if:
[[Image here]]
“(2) ... the pollutant is not listed in Subparagraph (h)(1) of this Section.”
Neither arsenic nor benzene is so listed. See § 335-3-14-.04(8)(h)(l).
The second subsection governing air quality impact analysis, § 335-3-14-.04(10), requires an analysis of the impact on air quality because of emissions from a new source or the modification of a previously existing source. The purpose of this analysis is to determine whether the proposed emissions source will violate air quality standards or increment limits for a particular pollutant. § 335-3-14-.04(10)(a) and (10)(b). No air quality standards or increment limits for arsenic and benzene exist in the Alabama regulations. § 335-3-14-.04.
Local 52 contends that, pursuant to federal regulations, specifically, 40 C.F.R. § 51.166(b)(23)(ii), any emissions increase of pollutants such as arsenic and benzene must be considered significant for purposes of the Clean Air Act. Therefore, it contends, even the admittedly small amounts of benzene and arsenic that would be released into the atmosphere by GE’s two new boilers would require a complete and detailed analysis of the impact of those two pollutants on the area surrounding GE, taking into account other local sources of those pollutants. However, as the United States Court of Appeals for the District of Columbia Circuit stated in ruling upon a similar situation:
“Categorical exemptions [from the clear commands of a regulatory statute such as the Clean Air Act] may also be permissible as an exercise of agency power ... to overlook circumstances that in context may fairly be considered de minimis. It is commonplace, of course, that the law does not concern itself with trifling matters, and this principle has often found application in the administrative context. Courts should be reluctant to apply the literal terms of a *797 statute to mandate pointless expenditures of effort..-..
“Determination of when matters are truly de minimis naturally will turn on the assessment of particular circumstances, and the agency will bear the burden of making the required showing. But we think most regulatory statutes, including the Clean Air Act, permit such agency showings in appropriate cases.”
Alabama Power Co. v. Costle, 636 F.2d 323, 360 (D.C.Cir.1979).
Richard Grusnick, chief of the air division of ADEM, testified that ADEM had calculated GE’s expected emissions of arsenic and benzene based on figures supplied by Local 52 during the comment period before the permits for the boilers were issued. Grus-nick testified that ADEM had determined from its calculations that the amounts of arsenic and benzene that might be emitted from GE’s boilers would have no adverse impact on the air quality.
Gary Rubenstein, an air quality consultant who presented expert testimony on behalf of Local 52, admitted on cross-examination that even when viewed in light of the more stringent California standards for arsenic and benzene emissions, GE’s boilers would not cause adverse consequences to the public health. In fact, Local 52 offered no evidence of any harm arising from the arsenic and benzene levels emitted by GE’s boilers other than complaints by two of its members of various problems with vegetation in their yards and gardens in the last few years. This testimony was not substantiated by any objective evidence as to what had caused those problems. Despite ADEM and GE’s failure to conduct a complete air quality impact analysis for arsenic and benzene, EPA considered and approved both permits.
The Commission stated that because an air quality impact analysis for arsenic and benzene “would not have resulted in any further requirements for control technologies on [GE’s] two boilers,” the issue was moot, and it held that the permits were “correctly written.” In light of the law and the evidence presented, we conclude that the Commission did not err in not requiring ADEM to perform an “air quality impact analysis” for arsenic and benzene before issuing the permits.
Based on the foregoing, we cannot hold that the trial court erred in holding that the decision of the Commission, upholding ADEM’s issuance of permits to operate two additional boilers at a plastics manufacturing plant operated by GE in Burkville, Alabama, was “supported by substantial evidence.” Therefore, the judgment of the trial court is due to be affirmed.
AFFIRMED.
THIGPEN and YATES, JJ., concur.